James E. Magleby (7247)
 magleby@mgpclaw.com
Eric K. Schnibbe (8463)
 schnibbe@mgpclaw.com
Jennifer Fraser Parrish (11207)
 parrish@mgpclaw.com
**MAGLEBY & GREENWOOD, P.C.**
170 South Main Street, Suite 850
Salt Lake City, Utah 84101
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Defendant Namecheap, Inc.

Eugene Rome (*pro hac vice*)
 erome@romeandassociates.com
**ROME & ASSOCIATES, A.P.C.**
2029 Century Park East, Suite 1040
Los Angeles, California 90067
Telephone: 310.282.0690
Facsimile:  310.282.0691

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **EMERGENCY ESSENTIALS, INC.**, a Utah corporation,<br><br>**Plaintiff,**<br><br>vs.<br><br>**NAMECHEAP, INC.**, a Delaware corporation d/b/a WHOISGUARD; **BLUEHOST, INC.**, a Utah corporation; **WILLIAM TINGLE**; and DOES 1 through 5,<br><br>**Defendants.** | **[CORRECTED] REPLY MEMORANDUM IN SUPPORT OF NAMECHEAP'S MOTION TO DISMISS**<br><br><br><br><br><br>**Case No. 2:11-CV-00411-BCW**<br><br>**Magistrate Judge Brooke C. Wells** |

Defendant Namecheap, Inc. ("Defendant" or "Namecheap"), through counsel of record hereby submits this Reply Memorandum in Support of Namecheap's Motion to Dismiss.[1]

---

[1] Unless otherwise noted, abbreviated terms are as defined in the Memorandum in Support of Namecheap's Motion to Dismiss, filed June 10, 2011 (Docket No. 17) (referred to herein as "Supporting Memo" or "Supp. Memo").  Plaintiff's Amended Memorandum in Opposition to Defendant Namecheap's Motion to Dismiss, filed 7/27/11 (Docket No. 30, Ex. A.), is referred to herein as "Opposition Memo" or "Opp. Memo."

## **TABLE OF CONTENTS**

Page

INTRODUCTION..........................................................................................iv

ARGUMENT................................................................................................ 1

I.   PLAINTIFF'S ATTEMPT TO RECHARACTERIZE THE ALLEGATIONS IN
     ITS AMENDED COMPLAINT DEFY THE REALITY OF INTERNET
     DOMAIN NAME REGISTRATIONS, THE STANDARD APPLICABLE TO
     MOTIONS TO DISMISS, AND NAMECHEAP'S "WHOISGUARD"
     SERVICE...................................................................................... 1

     A.   The Reality of Domain Name Registrars and the Internet......................... 1

     B.   Namecheap's Manner of Processing Registrations Anonymously is
          Lawful and Important and Does not Change Namecheap's Role as
          a Registrar ................................................................................ 3

     C.   The Court Should Reject Plaintiff's Attempt To Defeat Dismissal By
          Misapplying The Governing Rule 12(B)(6) Standard ................................ 6

     D.   Plaintiff Misreads the *Solid Host* Case Which Does Not Support the
          Characterization that Namecheap Acted Outside the Scope of Its
          Role as Registrar ....................................................................... 12

II.  PLAINTIFF PROVIDES NO VALID ARGUMENT TO SAVE ITS LANHAM
     ACT AND STATE LAW UNFAIR COMPETITION CLAIMS FROM
     DISMISSAL ...................................................................................... 14

III. PLAINTIFF'S HAVE NOT ALLEGED ANY FACTS DEMONSTRATING A
     BAD FAITH INTENT TO PROFIT FROM PLAINTIFF'S MARK, AS
     REQURIED FOR ITS CYBERSQUATTING CLAIMS ........................................ 18

IV.  THE COURT SHOULD REJECT PLAINTIFF'S ARGUMENTS
     ATTEMPTING TO MINIMIZE THE NINTH CIRCUIT'S *HOLDING* THAT
     THE EXCEPTION TO IMMUNITY UNDER THE CDA APPLIES ONLY TO
     FEDERAL INTELLECTUAL PROPERTY CLAIMS ........................................... 20

V.   THE COURT SHOULD REJECT PLAINTIFF'S ARGUMENT AS TO
     VICARIOUS LIABILITY UNDER ITS "AGENT FOR UNDISCLOSED
     PRINCIPLE [SIC]" THEORY................................................................. 25

CONCLUSION ......................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151 (D. Utah 2010) ............ 17

*Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009)...............v, 1, 2, 6, 7, 8, 9, 11, 16

*Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690
    (S.D.N.Y 2009)......................................................................................................... 22

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007)...... v, 1, 6, 7, 9, 11

*Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672 (9th Cir.2005)..................................... 14

*Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288 (D.N.H. 2008) ................. 21, 22

*GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610 (E.D. Va. 2003) ........ 3

*Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409 (S.D.N.Y. 2001)...................... 20

*In re Anonymous Online Speakers*, 2011 U.S. App. LEXIS 487, at *5
    (9th Cir., Jan. 7, 2011) ................................................................................................ 5

*In re Anonymous Online Speakers*, 611 F.3d 653 (9th Cir. 2010)................................... 5

*In re Ford*, 574 F.3d 1279 (10th Cir. 2009)................................................................... 22

*Inwood Labs. Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982) ........................................... 16

*Jarecki v. G.D. Searle & Co.*, 367 U.S. 303 (1961) ....................................................... 22

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999)..... 16, 17

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995) .............................................. 4

*P&G Co. v. Haugen*, 317 F.3d 1121 (10th Cir. 2003).................................................... 16

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007) ........................................ 20

*Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 2004 U.S. Dist Lexis 15895, *17, No. C 04-
    0371-JW (N.D. Calif. Aug. 5, 2004).................................................................... 16, 21

*Sandals Resorts Intl. Ltd. v Google, Inc.*, 86 A.2d 32, 44 (N.Y. App. Div. 2011) ............ 5

*Smith v. Network Solutions, Inc.,* 135 F. Supp. 2d 1159 (N.D. Ala. 2001) ....................... 2

*SolidHost, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092
(C.D. Cal. 2009) ............................................................. 12, 13, 14, 18, 19, 25

*Specht v. Google, Inc.*, 660 F. Supp. 2d 858 (N.D. Ill. 2009) ......................................... 15

*Talley v. California*, 362 U.S. 60 (1960) ...................................................................... 4, 5

*Tiffany Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) .................................................... 17

*Toomer v. City Cab*, 443 F.3d 1191 (10th Cir. 2006) ................................................... 22

*United States v. Killbride*, 507 F. Supp. 2d 1051 (D. Ariz. 2007) .................................... 3

*Universal Communications Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) ........ 20

*Utah Lighthouse Ministry v. Foundation for Apologetic Information & Research*, 527
F.3d 1045 (10th Cir. 2008) ..................................................................................... 14

**Statutes**

15 U.S.C. § 1125(a)(1) ................................................................................................. 14

15 U.S.C. § 7701(a)(1) ................................................................................................... 6

15 U.S.C. § 7701(b)(3) ................................................................................................... 6

47 U.S.C.] §230(e)(2) ................................................................................................... 20

**Rules**

Fed. R. Civ. P. 11(b) ..................................................................................................... 11

Fed. R. Civ. P. 12(6) ......................................................................................................iv

## INTRODUCTION

The Court should grand Namecheap's Motion to Dismiss because Plaintiff has offered no valid argument to show it actually states a claim against Namecheap on which relief may be granted.  Fed. R. Civ. P. 12(6).

First, there are numerous arguments raised in support of the Motion to Dismiss that Plaintiff wholly ignores, essentially conceding that dismissal is appropriate on those grounds.  Among others, Plaintiff does not demonstrate any way that Namecheap made any commercial use of Plaintiff's alleged trademarks in connection with any of Namecheap's goods or services and, therefore, Plaintiff's trademark claim against Namecheap must be dismissed.

Second, where Plaintiff does argue to save its Complaint as against Namecheap, those arguments are contrary to Plaintiff's actual allegations and the applicable law.

Plaintiff attempts to fundamentally recharacterize the actual allegations in its Complaint that recognized Namecheap was the registrar of the domain name and its WhoisGuard service merely affected the manner in which the domain was registered.  Plaintiff alleged it was Defendant Tingle, not Namecheap, that controlled the content that later appeared on the website that was published by Tingle with the domain name.  Rather than accepting its Complaint as alleged, Plaintiff attempts to argue it has stated that Namecheap was the registrant and owner of the website and, therefore, Plaintiff's various federal and state law claims should not be dismissed.

Plaintiff's arguments are untenable.  First, they ignore the real-world context of domain name registrations and the anonymous registration service provided by

Namecheap.  Second, Plaintiff's arguments do not comply with *Twombly* and *Iqbal* -- Plaintiff has made only conclusory assertions with regard to Namecheap operating the subject website, largely found within the threadbare recitations of the elements of causes of action.  There are no specific facts alleged as to Namecheap's ownership or control as to the website that could be taken as true, or that would support an actual plausible claim under the requirements of *Twombly* and *Iqbal*.  Consequently, regardless of Plaintiff's arguments now, the multitude of claims based upon the erroneous characterization of the alleged facts fail and must be dismissed.

The Court should also reject Plaintiff's arguments relative to Lanham Act and state unfair competition claims based upon alleged use of Plaintiff's marks.  Plaintiff essentially recognizes that these claims fail by arguing that has a claim against Namecheap for contributory infringement.  However, Plaintiff's Complaint is devoid of any claim for contributory infringement against Namecheap and does not allege facts showing that Namecheap intentionally induced Tingle (or anyone else) to infringe a trademark, that Namecheap supplied any product or service to Tingle while it knew of alleged infringement, or that Namecheap had any ability to monitor and control the content of the website that Tingle published on the subject domain.  Accordingly, there is no claim for contributory infringement and Plaintiff's unfair competition claims must be dismissed.

Plaintiff's arguments that attempt to widen the exception to immunity under the Communications Decency Act ("CDA") to save its state law claims are without merit.  As the Ninth Circuit has held, the exception for intellectual property law applies only to

federal, not state, intellectual property law.  Contrary to Plaintiff's arguments, the First

Circuit decision stating otherwise is pure dicta with no analysis whatsoever and there is,

therefore, no "circuit split" on the issue.  Moreover, the two lower court cases on which

Plaintiff relies are not persuasive.  Both cases were unduly reliant upon and deferential

to the First Circuit's dicta and both cases relied upon a textual analysis, but failed to fully

address the entire text of the statutory exception.

Finally, Plaintiff cannot rely upon the ICANN Registrar Accreditation Agreement

("RAA") to save its "Agent for Undisclosed Principle [sic]" claim.  Plaintiff has made no

allegations in the Complaint with regard to the RAA and has stated no claim for relief

based upon the RAA.  Moreover, the RAA expressly provides that it was not intended to

benefit any person other than ICANN and a signing registrar, and Plaintiff has

absolutely no rights arising from the RAA.

Accordingly, none of the arguments offered by Plaintiff can save the Complaint

from dismissal as against Namecheap.  The Court should grant Namecheap's Motion to

Dismiss.

**ARGUMENT**

I.   **PLAINTIFF'S ATTEMPT TO RECHARACTERIZE THE ALLEGATIONS IN ITS AMENDED COMPLAINT DEFY THE REALITY OF INTERNET DOMAIN NAME REGISTRATIONS, THE STANDARD APPLICABLE TO MOTIONS TO DISMISS, AND NAMECHEAP'S "WHOISGUARD" SERVICE**

As a fundamental, overarching flaw in Plaintiff's opposition to the Motion to Dismiss, Plaintiff attempts to recharacterize its allegations from the facts actually alleged to ones that do not square with the reality of how internet domain name registrations are conducted and websites are created.[2]  They also disregard the specific pleading requirements under *Twombly* and *Iqbal* and standard applied by this Court on a Motion to Dismiss, and otherwise distort the reality of Namecheap's WhoisGuard service.  That is, to oppose dismissal, Plaintiff incorrectly attempts to defeat the specific factual allegations of its Complaint by which Namecheap was alleged and admittedly only the registrar of the subject domain name, and morph those allegations into statements that Namecheap was the "registrant" of the domain, and owned and controlled the content on the website that later appeared at the domain.  The morphed allegations simply do not correspond with reality.

A.   **THE REALITY OF DOMAIN NAME REGISTRARS AND THE INTERNET**

In Namecheap's Supporting Memorandum, it explained the context by which domain names are registered, including the historical manner in which those registrations have changed.  [*See* Supp. Memo at ix n.1, x n.2].  As stated below, it is within this context that Plaintiffs' allegations must be reviewed and, under *Twombly* and

---

[2] [*See, e.g.*, Opp. Memo, Argument Part D.2 (arguing DMCA safe harbors should not apply because Namecheap should be viewed as a registrant, rather than registrar].

*Iqbal*, determined whether Plaintiff has alleged a plausible claim against Namecheap.

In addition to the context previously stated, because Plaintiff seeks now to recharacterize its allegations, it bears repeating the fundamental relationships with regard to domain name registrations.  In particular, one wishing to use a specific domain name must register the name with one of numerous competing companies known as "registrars."  Registrars control the IP addresses associated with particular domain names, but do not generally control the content published on a host computer for a website tied to a registered domain name.[3]  Customers seeking to register specific domain names interact with registrars; the registrars submit information regarding domain names to the registry, which includes the information in the public Whois database.  *Smith v. Network Solutions, Inc.,* 135 F. Supp. 2d 1159, 1162 (N.D. Ala. 2001).

Generally, an individual seeking to use a domain name submits an online application to a registrar.  *Id.* at 1161-62.  "[I]f someone submits an application for a particular domain name that already exists in the Registry WHOIS database by virtue of a prior registration, that name cannot be registered again, and the applicant is advised that the sought domain name is unavailable. . . . If there is no existing registration for a given [second-level domain] SLD name within a given TLD, [however,] that domain name is considered available and generally may be registered on a first-come, first

---

[3] There are numerous domain name registrars, which operate in a competitive industry. In addition to "Namecheap.com," other commonly known registrars, and Namecheap's competitors, include "GoDaddy.com" and "Register.com."  A listing ICANN-accredited TLD registrars is available at the following URL: http://www.icann.org/en/registrars/accredited-list.html.

served basis."  *Id.* at 1162.

A "registrant" is the individual or entity who submits an application to a "registrar" to obtain a domain name and who thereafter controls the content published in connection with that domain name.[4]  Notwithstanding Plaintiff's attempt to recharacterize its allegations to push Namecheap into a registrant, the actual specific allegations are that Namecheap did not submit the application for the subject domain name -- Tingle did -- Namecheap cannot be and was not a registrant here.  Rather, as stated in the Complaint "Defendant Namecheap is ***a registrar*** of domain names used on the Internet."  [Compl. ¶ 8 (emphasis added)].

### B.   NAMECHEAP'S MANNER OF PROCESSING REGISTRATIONS ANONYMOUSLY IS LAWFUL AND IMPORTANT AND DOES NOT CHANGE NAMECHEAP'S ROLE AS A REGISTRAR

The Court should reject Plaintiff's attempt to characterize Namecheap's WhoisGuard service as something nefarious and use it to bootstrap Namecheap into the role of "registrant" as a basis to avoid applicable law that defeats Plaintiff's claims.

First, when a registrant opts to use the WhoisGuard service, it in no way changes

---

[4] *See United States v. Killbride*, 507 F. Supp. 2d 1051 (D. Ariz. 2007) (stating "the obvious definition of 'registrant' [is] "[o]ne who registers' and 'who thereby gains a particular entitlement'" which "clearly refers to one who registers a domain name with a registrar and thereby gains the right to use the name in email and on the Internet.") (quoting Oxford English Dictionary (2d ed. 1989) (second alteration in original); *see also* http://www.icann.org/en/resources/ ("A registrar is a company that facilitates the registration of domain names."); ICANN Registrar Accreditation Agreement ("RAA") § 1.10 ("The word 'registrar,' when appearing without an initial capital letter, refers to a person or entity that contracts with Registered Name Holders and with a Registry Operator and collects registration data about the Registered Name Holders and submits registration information for entry in the Registry Database."); *see, e.g.*, *GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 623 (E.D. Va. 2003) (observing different roles in connection with issue of jurisdiction in the United States).

the fact that Namecheap is still the registrar and not somehow transformed into a registrant itself.  As the Complaint states, "Namecheap provides a service **to domain name owners** who register their domain names with Namecheap called 'WhoisGuard.'" [Compl. ¶ 11 (emphasis added)].  Rather, such a selection by the registrant merely determines the *manner* in which Namecheap carries out its actions *as a registrar* by listing WhoisGuard contact information in the registry that is searched through the whois protocol.  Just as with any other registrar offering anonymous domain name registration, the name placed into the registry -- whether that be "WhoisGuard," "John Doe," or "Private" -- does not alter that Namecheap's conduct remains limited to "collect[ing] registration data about the Registered Name Holders and submit[ting] registration information for entry in the Registry Database," ICANN RAA § 1.10, and Namecheap is not seeking to itself own the domain name or use it in email or on the internet.

Second, the anonymous registration of domain names is unquestionably legal and its importance to free speech and privacy cannot be overstated.  As the United States Supreme Court has explained, "'[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind.'"  *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341 (1995) (quoting *Talley v. California*, 362 U.S. 60, 64 (1960)).  Anonymous speech fosters the creation of works of art that might otherwise be dissuaded due to "fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."  *Id.* at 341-42.  Moreover, "the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring

4

disclosure as a condition of entry." *Id.* at 342.  Indeed, "'persecuted groups and sects

from time to time throughout history have been able to criticize oppressive practices and

laws either anonymously or not at all,'" and anonymity "provides a way for a writer who

may be personally unpopular to ensure that readers will not prejudge her message

simply because they do not like its proponent." *Id.* (quoting *Talley*, 362 U.S. at 64).

"Although the Internet is the latest platform for anonymous speech, online speech

stands on the same footing as other speech." *In re Anonymous Online Speakers*, 611

F.3d 653, 657 (9th Cir. 2010).[5]  Indeed, the internet is uniquely situated to provide a

means to foster free speech because it has lower barriers to entry than other forms of

media.[6]

    In addition to promoting free speech, Namecheap's WhoisGuard service has

other plainly legitimate purposes, including permitting domain name registrants to avoid

SPAM and protecting privacy against information harvesting.  The United States

Congress has recognized the importance of e-mail; that the convenience and efficiency

of e-mail "are threatened by the extremely rapid growth in the volume of unsolicited

commercial electronic mail"; that SPAM "may result in costs to recipients who cannot

refuse to accept such mail and who incur costs for the storage of such mail, or for the

time spent accessing, reviewing, and discarding such mail, or for both"; and that SPAM

---

[5] *Accord In re Anonymous Online Speakers*, 2011 U.S. App. LEXIS 487, at *5 (9th Cir., Jan. 7, 2011) (withdrawing and replacing 611 F.3d 653, but containing same quotation).

[6] *Sandals Resorts Intl. Ltd. v Google, Inc.*, 86 A.2d 32, 44 (N.Y. App. Div. 2011) (noting "'the low barrier to speaking online allows anyone with an Internet connection to publish his thoughts, free from the editorial constraints that serve as gatekeepers for most traditional media of disseminating information.'") (citation omitted).

"contains material that many recipients may consider vulgar or pornographic in nature."

15 U.S.C. § 7701(a)(1) to (5).  Moreover, many SPAM senders "use computer programs

to gather large numbers of electronic mail addresses on an automated basis from

Internet websites or online services where users must post their addresses in order to

make full use of the website or service."  *Id.* § 7701(a)(10).  Accordingly, Congress

determined it is public policy that "recipients of commercial electronic mail have a right

to decline to receive additional commercial electronic mail from the same source."  15

U.S.C. § 7701(b)(3).  Because the WhoisGuard service protects private e-mail

addresses of domain name registrants from this automated data-mining to generate

SPAM and impose its substantial costs and burdens upon registrants, as recognized by

Congress, the service is unquestionably legitimate and provides no valid reason to

impose liability upon Namecheap for conduct that Plaintiff alleges was committed

entirely by Tingle and/or Bluehost.

## C. THE COURT SHOULD REJECT PLAINTIFF'S ATTEMPT TO DEFEAT DISMISSAL BY MISAPPLYING THE GOVERNING RULE 12(B)(6) STANDARD

The Court should reject Plaintiff's arguments that seek to maintain its Complaint

notwithstanding the governing Rule 12(b)(6) standard.  In this regard, Plaintiff

acknowledges that the governing standard is set forth in *Twombly*[7] and *Iqbal*,[8] [*see*

Opp. Memo at 1-2 (citing cases)], but then proceeds to rely entirely upon pre-*Twombly*

cases regarding the standard [*see* Opp. Memo at 1] and argues the Complaint's

---

[7] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007).

[8] *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (2009).

allegations are sufficient as to Namecheap although they fall far short of the actual standard.

As described in *Iqbal*, the Court determines this Motion through a "two-pronged approach." *Iqbal*, 129 S. Ct. at 1950.  First, the Court determines whether allegations in the complaint must be accepted as true.  *Id.* at 1949-50.[9]  In this regard, Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 1949.  Allegations will not be taken as true when "[a] pleading . . . offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" *id.* (quoting *Twombly*, 550 U.S. at 555), or when "a complaint . . . tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

Second, the Court determines whether the "sufficient factual matter, accepted as true," actually "state[s] a claim to relief that is plausible on its face."  *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for <u>more than a sheer possibility</u> that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556, 557) (emphasis added).  Moreover, determining whether a complaint states a "plausible" claim for relief, will "be a <u>context-specific task</u> that requires the reviewing

---

[9] *See also  id.* at 1951 ("We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth.")

court to draw on its judicial experience and common sense," *id.* at 1950 (citation omitted) (emphasis added), and "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief.'" *Id.* (citation omitted).

Plaintiff's Opposition Memo wholly disregards both prongs of this governing standard.  First, Plaintiff argues the Motion should be denied based upon the Complaint's naked assertions, legal conclusions, formulaic and threadbare recitations of elements, and unsupported conclusory elements.  Further, even when Plaintiff's allegations against Namecheap go beyond the conclusory, they do not show facts supporting a "plausible" claim within the context of domain registrars and the internet as described above.  *See supra*, Argument Part I.A & B.  Plaintiff's argument that it has alleged sufficient facts by misapplying the applicable standard permeate its Opposition Memo.[10]

As an initial matter, a large portion of supposedly alleged facts that Plaintiff now argues supports its claims against Namecheap are, in actuality, bald and cursory assertions of conduct by "Defendants" that are taken from the "[t]hreadbare recitals of the elements of a cause of action."  *Iqbal*, 129 S. Ct. at 1949.  For example, Plaintiff asserts it properly alleges an unfair competition claim against Namecheap because the

---

[10] Plaintiff makes these flawed assertions in an attempt to sustain its First, Second and Fifth Claims for Relief (trademark infringement and unfair competition under Lanham Act and Utah law), [Opp. Memo, Argument, Part B]; Third and Eighth Claims for Relief (cybersquatting under federal and Utah law), [Opp. Memo, Argument, Part C]; Seventh Claim for Relief (Truth in Advertising Act), [Opp. Memo, Argument, Part E.1]; Ninth Claim for Relief (unjust enrichment) [Opp. Memo, Argument, Part E.2]; Tenth Claim for Relief (civil conspiracy), [Opp. Memo, Argument, Part E.3]; and Thirteenth Claim for Relief (agent for undisclosed principle [sic]) [Opp. Memo, Argument, Part E.4].

Complaint "alleges unauthorized use of the Marks on the Website by Defendants, including Namecheap," citing to Paragraphs 50-51 of the Complaint that is merely the recitation of elements of an unfair competition cause of action. [*See* Opp. Memo at 5; Compl. ¶ 50-51]. Plaintiff asserts it alleged proper state and federal cybersquatting claims against Namecheap because it "has also alleged that Namecheap registered the domain name for the Website" citing, among others, Paragraphs 58-60 of the Complaint that, again, are merely the recitations of elements of a cybersquatting claim. [*See* Opp. Memo at 8; Compl. ¶¶ 58-60]. And Plaintiff asserts that its state law claims are properly pled because the Complaint "states that Defendants, including Namecheap, violated [Plaintiff's] rights under applicable state laws," citing to Paragraphs 49-52, 72-75, 81-82, 86, 97-98, and 101 that, again, are merely cursory recitations of elements in, respectively, the Second, Fifth through Seventh, and Ninth through Tenth Claims for Relief. [*See* Opp. Memo at 14; Compl. ¶¶ 49-52, 72-75, 81-82, 86, 97-98, 101]. None of these allegations meet the requirements of *Twombly* and *Iqbal* and they cannot be accepted as true by this Court in ruling upon this Motion to dismiss.

Further, Plaintiff relies upon its inclusion of the word "or" to argue that it has alleged "the alternate[11] theories that William Tingle ("Tingle") was 1) the licensee of the [subject] Website, 2) the principal of the Website, or 2) [sic] the actual registrant of the website," [Opp. Memo at vii, ¶ 2], which Plaintiff then attempts to bootstrap into an allegation that Namecheap was "the registrant of the Website and owner" during the time of the claimed infringement to support virtually all Plaintiff's purported claims. [*E.g.*,

---

[11] Notably, the Complaint does not even contain the words "alternative" or "alternate," let alone expressly give notice that Plaintiff was basing claims upon alternative sets of fact.

Opp. Memo at 10 n.3, 14].  However, even assuming there was such a license, the existence of that license means it would be Tingle, rather than Namecheap, actually controlling the content appearing on the website because without such control there would be no purpose for the license.  Further, Plaintiff alleges no facts that would permit the inferential leap to an allegation of Namecheap's ownership or control of the website appearing at the domain -- Plaintiff provides no facts as to the nature of that license, the terms of that license, or when the license was entered.  Accordingly, even if Plaintiff actually alleged control by Namecheap based upon this license -- which it did not -- such a cursory allegation could not be accepted as true.  Further, even if had alleged that Namecheap actually owned or controlled the website appearing at the domain, such an allegation would not be "plausible" in light of the context of domain name registrations where it is the registrants, not registrars, that control content appearing on a website.[12]

Likewise, there are no facts alleged to support the conclusory assertions of some affiliation between Namecheap and Tingle that in any way pertains to the actually claimed wrongful conduct.  Rather, the only specific facts alleged are (a) that Namecheap acted as a registrar by processing Tingle's domain name application in a manner that included WhoisGuard contact information, (b) that "Tingle [not Namecheap] repeatedly placed the infringing EMERGENCY ESSENTIALS trademark on the website"

---

[12] As a further example, the domain name <uscourts.gov> was registered through the General Services Administration.  https://www.dotgov.gov/portal/web/dotgov/welcome. Nonetheless, the website appearing at that domain "is maintained by the Administrative Office of the U.S. Courts on behalf of the Federal Judiciary" and it is the Federal Judiciary that controls content appearing on the website, not the GSA. http://www.uscourts.gov/Home.aspx.

[Compl. ¶ 23]; and (c) that Namecheap did not "promptly" respond to a letter.  Those specific allegations are not enough for the Court to accept as true that there was any such license, that Namecheap owned the website that appeared at the domain, that Namecheap was a "registrant" rather than "registrar" of the website, or that Namecheap controlled the content of that website.  Moreover, even if the Court accepted those alleged conclusions as true, they show nothing more than the mere <u>possibility</u> of misconduct by Namecheap.  Rather, within the context of anonymous domain name registrations (including the WhoisGuard service) and the internet explained above and in the Supporting Memorandum, Plaintiff's allegations unquestionably fail to state a "plausible" claim consistent with the requirements of *Twombly* and *Iqbal*, because they do not show why Namecheap would do anything more than act as a simple domain name registrar relative to Tingle -- why is Tingle so special?[13]

Indeed, Plaintiff's failure to plead <u>any specific facts</u> showing misconduct by Namecheap due to actual control or involvement with the website that eventually appeared at the domain is underscored by Plaintiff's reliance now upon the absence of its own express negating allegations.  That is, Plaintiff asserts it "did not allege that Namecheap <u>did not</u> have control over the domain name or Website."  [Opp. Memo at vii ¶ 2 (emphasis added)].  However, it is the actual content of the Complaint, not what may have been left out, that matters and the lack of an allegation negating control does not change that Plaintiff's Complaint fails to allege specific facts <u>showing that control</u>.

---

[13] Plaintiff likely did not allege facts showing Namecheap's use, ownership, or control of the subject website appearing at the registered domain name because it had no factual basis for doing so and no such basis exists.  *See* Fed. R. Civ. P. 11(b).

Likewise, Plaintiff's argument now that its Complaint as to Namecheap should survive unless Namecheap actually offers evidence to prove negatives is without merit.[14]  This is a Motion to Dismiss and if Plaintiff's Complaint is deficient it should be dismissed without requiring Namecheap to disprove nonexistent and unalleged facts.

### D.  PLAINTIFF MISREADS THE *SOLID HOST* CASE WHICH DOES NOT SUPPORT THE CHARACTERIZATION THAT NAMECHEAP ACTED OUTSIDE THE SCOPE OF ITS ROLE AS REGISTRAR

The Court should further reject Plaintiff's attempt to argue Namecheap acted outside its role as registrar merely because it processed the registration in connection with its WhoisGuard service, and is therefore potentially liable for unfair competition claims, because they rest an a fundamental misreading of *SolidHost v. Namecheap*, 652 F. Supp. 2d 1092 (C.D. Cal. 2009).  [*See* Opp. Memo, Argument, Part B.1.A].

*SolidHost* provides no support for the proposition Plaintiff asserts, that Namecheap may be held liable merely because the subject domain was registered in connection with Namecheap's WhoisGuard service.  In that case, the Court denied dismissal sought on the sole grounds that Namecheap was a Registrar.  *Id.* at 1105.  However, that court did so based upon alleged facts that are starkly different from those alleged here.  The specifically alleged facts, taken as true for purpose of the motion to dismiss, was that another defendant, eNom -- not Namecheap -- acted as the registrar of the subject domain name.  Further, (1) the infringement consisted of using the

---

[14] [*See, e.g.*, Opp. Memo at vii, ¶ 4 ("[T]here is no evidence of record that Goldstein [sic] is not affiliated with Namecheap"); *id.* at 9 (stating "Namecheap has presented no evidence that it has trademark or intellectual property rights in the Marks."); *id.* at 14 (stating "Namecheap has provided no evidence that Defendants Tingle or Bluehost were not affiliated with Namecheap"); *id.* at 17 ("Namecheap has put forth no evidence as to why it was reasonable to take two months to respond to [Plaintiff's]" letters)].

domain name itself, not as a result of the content appearing at the domain, *id.* at 1097;
(2) a hacker had stolen the trademark domain name and moved it to the control of
Namecheap, *id.*; (3) and Namecheap, though preferring to remain neutral, had the
unquestioned ability to return the domain name back to the plaintiff, which would cause
"Doe's illegal activity [to] have ceased."  *Id.* at 1115.

 For the *SolidHost* court, the critical factor was that eNom -- and not Namecheap -
- was alleged to have been the actual registrar of the domain name.  Consequently,
Namecheap's WhoisGuard service was not implemented as part of Namecheap's role
as registrar, but as a service separate and apart from a registrar's role:

> Solid Host does not allege that NameCheap acted as a registrar; that is, it did
> not allege that NameCheap processed the registration for <solidhost.com>,
> either for Doe or on its own behalf.  Although some registrars, perhaps
> including NameCheap, offer anonymity services at the time of registration, Solid
> Host alleges that Doe used NameCheap's anonymity service
> *independent of its domain name registration service*.

*Id.* at 1103 (emphasis added); *see also id.* (stating "it appears clear that he did not gain
access to the domain name by submitting an application to NameCheap to register it").

 Accordingly, it was only because there was no connection between the
registration and the WhoisGuard service that the *SolidHost* court found Namecheap
was alleged to be acting outside its capacity as registrar.  Indeed, the court expressly
recognized that result may be different "if [Namecheap] acted as the registrar for
<solidhost.com>."  *Id.* at 1105-06.  The court further recognized that "a registrar is not
liable under § 1125(d) *when it acts a registrar,* i.e., when it accepts registrations for
domain names from customers."  *Id.* at 1104 (second emphasis added).  In this case,
Plaintiff alleges that the subject domain name was registered by Namecheap, not any

other registrar, and that registration was accomplished as part of Namecheap providing its WhoisGuard service.  [Compl. ¶¶ 8, 18].  Accordingly, unlike in *SolidHost*, Namecheap is not alleged to have acted outside its capacity as registrar and it cannot be held liable for Plaintinff's unfair competition claims merely by virtue of the WhoisGuard service.

## II.   PLAINTIFF PROVIDES NO VALID ARGUMENT TO SAVE ITS LANHAM ACT AND STATE LAW UNFAIR COMPETITION CLAIMS FROM DISMISSAL

The Court should reject Plaintiff's arguments that attempt to save its Lanham Act and dependent Utah Unfair Competition Act ("UCA") claims from dismissal.  Plaintiff's arguments defy the actual content of the Complaint,[15] ignore the wholesale failure to allege any commercial use by Namecheap, and attempt to create a contributory infringement claim that was neither pled nor supported by good law.

First, Plaintiff wholly ignores that to state a valid unfair competition claim against Namecheap, it must allege facts showing that Namecheap "used the plaintiff's mark 'in connection with any goods or services,'" which is "commonly described as the commercial use requirement."  *Utah Lighthouse Ministry v. Foundation for Apologetic Information & Research*, 527 F.3d 1045, 1052 (10th Cir. 2008) (citing 15 U.S.C. § 1125(a)(1)); *cf. Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 677 (9th Cir.2005).

---

[15] As described above, Plaintiff asserts it has stated these unfair competition claims against Namecheap, as opposed to just Tingle and/or Bluehost, by alleging that Namecheap was the actual registrant, owner, and controller of the content on the infringing website that appeared at the domain.  However, as addressed above, Plaintiff has not actually alleged such facts in a manner that (a) they could be taken as true or (b) could state a plausible claim under *Iqbal.*  [*See supra*, Argument, Part II].  Further, *SolidHost* provides no support for holding that Namecheap in this case acted outside its capacity as a registrar.

Other than Plaintiff improperly characterizing Namecheap now as the actual operator for the offending website -- which is not true, plausible, or even actually alleged -- Plaintiff never explains how its allegations actually state that <u>Namecheap</u>, rather than Tingle or Bluehost, used the mark with any of <u>Namecheap's services</u>.  Again, as recognized in the Complaint, Namecheap is a registrar, conducting business under the "Namecheap" name, and there is no allegation the subject marks were employed in any manner whatsoever in connection with Namecheap's registration services.  Likewise, there is no allegation or basis for allegation that Namecheap used the marks to market its anonymous domain registrations through the WhoisGuard service.  Consequently, the Lanham Act Claim and Utah UCA claims fail as a matter of law against Namecheap and must be dismissed.

Second, Plaintiff's arguments relative to contributory trademark infringement are completely without merit.  As an initial matter, the Complaint does not actually state any claim for contributory infringement under the Lanham Act against Namecheap -- the Complaint's Fourth Claim for Relief is stated <u>only</u> against Bluehost -- and for that reason alone, Plaintiff has not stated such a claim and its arguments provide no reason to deny the Motion to Dismiss.[16]

Moreover, Plaintiff's allegations demonstrate it cannot state a valid claim against Namecheap for contributory infringement.  Secondary liability for infringement arises when a defendant "'intentionally induces another to infringe a trademark, or if it

---

[16] *See Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 865 (N.D. Ill. 2009) ("With regards to the contributory and vicarious infringement, the FAC fails to mention either of these legal claims, much less plead each with supporting facts.  Plaintiffs, therefore, have not satisfied the burden of pleading these claims under Rule 8.").

continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement.'"  *P&G Co. v. Haugen*, 317 F.3d 1121, 1128 (10th Cir. 2003) (quoting *Inwood Labs. Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 853-54 (1982)).

Regarding the first prong, there are no specific facts alleged in the Complaint that in any way show Namecheap intentionally induced Tingle to place the mark "EMERGENCY ESSENTIALS" on the website that Tingle created at the domain. Rather, Namecheap merely provided registrar services and processed Tingle's domain name application in connection with the WhoisGuard service that substituted contact information in the Whois database.  The registration process itself could not be an infringement upon Plaintiff's marks and there is no specific allegation that can be accepted as true under *Iqbal* that would demonstrate Namecheap had any control over the website or did anything to cause Tingle to publish a website at the domain that used the mark.  *See Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 2004 U.S. Dist Lexis 15895, *17, No. C 04-0371-JW (N.D. Calif. Aug. 5, 2004) ("Although the complaint contains the allegation that Defendants 'are knowingly inducing' the alleged infringing conduct, there are no facts presented in the complaint that support such an allegation.").

Regarding the second prong, this case is "squarely on the 'service' side of the product/service distinction suggested by *Inwood Lab* and its offspring."  *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999).  Accordingly, Plaintiff cannot state such a claim against Namecheap unless the facts alleged show "[d]irect control and monitoring of the instrumentality used" by Tingle.  *Id.*  Indeed, in the online context, "[f]or contributory trademark infringement liability to lie, a service provider

16

must have more than a general knowledge or reason to know that its service is being used to [infringe].  Some <u>contemporary</u> knowledge of which particular listings are infringing or will infringe in the future is necessary."  *Tiffany Inc. v. eBay, Inc.*, 600 F.3d 93, 107 (2d Cir. 2010) (emphasis added).  The Complaint contains no facts to show that Namecheap directly controlled or monitored the content of the website that Tingle placed on the domain.  In reality, domain name registrars, including those providing anonymous registration services, do not constantly monitor the internet and content of websites using the domains and any requirement to do so would place an unimaginable burden upon them.  *See Lockheed Martin Corp.*, 194 F.3d at 985 (citation omitted) ("While the landlord of a flea market might reasonably be expected to monitor the merchandise sold on his premises, [a registrar] cannot reasonably be expected to monitor the Internet.").  Indeed, in context of domain name registrations, because the registration of the name necessarily comes <u>before</u> any website is published at the domain, Namecheap did not have reason to know of any infringement at the time it provided services to Tingle.  Further, even assuming that the letters sent to Namecheap provided reason to know of the infringement, the Complaint does not allege conduct by Namecheap <u>thereafter</u> to have provided any further services to Tingle.  *1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1184 (D. Utah 2010) ("'[T]he doctrine of contributory trademark infringement should not be used to require defendants to refuse to provide a product or service to those who merely might infringe the trademark.'") (citation omitted).

17

As noted above, this case is not remotely close to the control shown in the analogized context of Namecheap being the "'cyber-landlord' of the internet" that might subject it to liability for contributory infringement. *SolidHost, NL v. Namecheap, Inc.*, 652 F. Supp. 2d 1092, 1115 (C.D. Cal. 2009). In *SolidHost*, for example, a claim was stated for contributory infringement where (1) the infringement consisted of using the domain name itself, not the content appearing at the domain, *id.* at 1097; (2) a hacker had stolen the domain name and moved it to the control of Namecheap, *id.*; (3) and Namecheap, though preferring to remain neutral, had the unquestioned ability to return the domain name back to the plaintiff, which would cause "Doe's illegal activity [to] have ceased." *Id.* at 1115. Here, in distinction, Namecheap had no control over the content of the website using the registered domain. Nothing done by Namecheap could have stopped the infringement, because Tingle could simply have moved the domain to another service provider. Even if Namecheap would have immediately disclosed Tingle's identity, that disclosure would not have changed the content of the website or stopped the alleged infringement. Consequently, this is not the case where Namecheap had control over the infringement and Plaintiff cannot hold Namecheap secondarily liable for Tingle's alleged misconduct.

## III.   PLAINTIFF'S HAVE NOT ALLEGED ANY FACTS DEMONSTRATING A BAD FAITH INTENT TO PROFIT FROM PLAINTIFF'S MARK, AS REQURIED FOR ITS CYBERSQUATTING CLAIMS

Plaintiff makes a lengthy discussion regarding its state and federal cybersquatting claims, but fails to articulate any alleged facts that show Namecheap had any bad faith intent to profit from Plaintiff's Marks. As demonstrated in

Namecheap's Supporting Memo, Plaintiff cannot and the claims are properly dismissed.

Plaintiff attempts to argue that its state law claim should not be dismissed because, Plaintiff argues, "merely assisting the maintenance of a domain name with knowledge that it was registered or is being maintained with a bad faith intent to profit is actionable." [Opp. Memo at 10 (citing Utah Code Ann. § 70-3a-309(d)(ii))].  First, this is a plain misconstruction of the cited section.  The section does not describe "mere" conduct that "is actionable," but rather a limitation on liability, where a party may not be held liable, even if all other elements are satisfied.  Utah Code Ann. § 70-3a-309(d)(ii) ("A person may not be held liable under this section absent a showing of bad faith intent to profit from the registration or maintenance of the domain name.").  Even so, Plaintiffs have alleged not a single affirmative act (only inaction), including accepting any renewal fee for the domain, that was committed by Namecheap after Plaintiff alleges it gave Namecheap notice of the infringement.  That is not sufficient even under Plaintiff's mis-articulation of the statute.

Further, it bears noting that although Plaintiff relies so heavily on the *SolidHost* case elsewhere, Plaintiff makes no mention of it with regard to the cybersquatting claims.  Obviously, that is because the *SolidHost* court went on to rule the plaintiff could not state direct cybersquatting claims against Namecheap because there was no alleged facts to support a bad faith intent to profit from the mark:  "Nothing in the complaint suggests that by affording Doe the benefits of anonymous registration, NameCheap sought to benefit in any way from the goodwill associated with Solid Host's mark."  *SolidHost,* 652 F. Supp. 2d at 1110.

19

**IV.    THE COURT SHOULD REJECT PLAINTIFF'S ARGUMENTS ATTEMPTING TO MINIMIZE THE NINTH CIRCUIT'S *HOLDING* THAT THE EXCEPTION TO IMMUNITY UNDER THE CDA APPLIES ONLY TO FEDERAL INTELLECTUAL PROPERTY CLAIMS**

Plaintiff argues that the exception to Namecheap's immunity under the Communications Decency Act is broader than applied in *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007) ("In the absence of a definition from Congress, **we construe the term "intellectual property" to mean "federal intellectual property**.") (emphasis added).  Those arguments are in error.

First, Plaintiff incorrectly states that "the Circuits are split as to the breadth of [47 U.S.C.] §230(e)(2)'s exception."  [Opp. Memo at 11].  This is plainly untrue.  The only circuit court of appeals to consider directly the issue of whether the term "intellectual property" in section 230(e)(2) means "federal intellectual property" or "federal and state intellectual property" is the Ninth Circuit in *Perfect 10*, and the *Perfect 10* court squarely held that it means only "federal intellectual property."  The only other circuit court even cited by Plaintiff is *Universal Communications Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413 (1st Cir. 2007) ("*Lycos*").  However, that court did not in any way analyze the meaning of "intellectual property," and merely assumed, without any analysis whatsoever, that it would also include state intellectual property claims.[17]  As the Ninth Circuit and a lower

---

[17] The *Lycos* court's entire discussion relevant to the issue was limited to the following: UCS's remaining claim against Lycos was brought under Florida trademark law, alleging dilution of the "UCSY" trade name under Fla. Stat. § 495.151.  Claims based on intellectual property laws are not subject to Section 230 immunity.  *See* 47 U.S.C. § 230(e)(2) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."); *see also Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d 409, 413 (S.D.N.Y.

court in the First Circuit have recognized, the statement by the *Lycos* court is pure dicta because the breadth of section 230(e)(2) was not decided and was not necessary to its decision.[18]  Because there is no other circuit court decision squarely dealing with this issue, it is simply not true that there is currently a circuit split.  This Court should follow the more authoritative application by the Ninth Circuit in *Perfect 10*.

Second, the two lower court decisions cited by Plaintiff and ruling differently than *Perfect 10* have flawed analyses that should not be persuasive to this Court.[19]

In *Doe*, the court's analysis was fueled by its view that it should weigh heavily and defer to the result articulated in dicta in *Lycos*, which result, in turn, affected the remainder of its reasoning to construe the CDA's immunity as excepting state intellectual property claims.  As that court stated:

> Nevertheless, just as the First Circuit accords considerable deference to dicta in Supreme Court opinions, this court "accords substantial deference to the considered dicta of the court of appeals."  This court will follow First Circuit dicta over the contrary holding of another appeals court, then, <u>absent a particularly compelling reason to do otherwise</u>.

---

2001) (finding that the "plain language of Section 230(e)(2) precludes [the defendant's] claim of immunity" from a claim for trademark infringement). 478 F.3d at 422-23.

[18] *See Perfect 10*, 488 F.3d at 1119 n.5 ("The First Circuit was able to sidestep the question of what counted as intellectual property on Fist Amendment Grounds."); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 298-99 (D.N.H. 2008) ("Because the court of appeals would have upheld the dismissal of the plaintiff's state-law claim regardless of its interpretation of 47 U.S.C. § 230(e)(2), its statement in that regard arguably fits the usual definition of dicta . . . .").

[19] The only cases, besides *Lycos*, cited by Plaintiff are *Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y 2009) and *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288 (D.N.H. 2008).  [Opp. Memo at 14-16].  Inasmuch as these are <u>district court</u> decisions, Plaintiff's assertion that they reflect the law governing the entire "First and Second Circuits," [Opp. Memo at 16], is entirely without merit.

*Doe*, 540 F. Supp. 2d at 299 (emphasis added).  Accordingly, unless the *Doe* court found a "particularly compelling reason" to reach a different result, it was admittedly and erroneously predisposed to follow the dicta of the First Circuit in *Lycos*.  The *Atlantic Recording* case, in turn, relies heavily upon *Doe* and its analysis is, therefore, similarly impacted by the predisposition to follow this dicta.  603 F. Supp. 2d at 703.

Further, the *Doe* court attempted to engage in a textual analysis of section 230(e), by comparing part (1) and part (2) and concluding that reference in part (1) to "federal" criminal laws, not also found in part (2), meant part (2) was intended to apply to both state and federal intellectual property laws.  *Doe*, 540 F. Supp. 2d at 300.  That analysis is flawed because it omits the overall construction of section 230(e) and even terms within parts (1) and (2).  Likewise, although the *Atlantic Recording* court attempted a broader textual analysis, it did not properly consider that the overall statutory scheme is more consistent with interpreting the undefined term of "law pertaining to intellectual property" as referring to federal intellectual property laws.[20] Properly considering the entire text of section 230(e) supports the Ninth Circuit's holding that also furthers the explicit Congressional intent that was also written into the express provisions of the statute in section 230(a) and (b).

---

[20] *See In re Ford*, 574 F.3d 1279, 1289 (10th Cir. 2009) ("'The maxim noscitur a sociis, that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.'") (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)); *Toomer v. City Cab*, 443 F.3d 1191, 1194 (10th Cir. 2006) (stating "[w]hen construing a statute, we should give effect, if possible, to every clause and word").

Section 230(e) provides, in its entirety:

> (e) Effect on other laws.
> (1) No effect on criminal law.  Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this Act, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, United States Code, or any other Federal criminal statute.
> (2) No effect on intellectual property law.  Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.
> (3) State law.  Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.
> (4) No effect on communications privacy law.  Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

47 U.S.C. § 230(e).  Part (1) begins by generally referring to "[n]o effect on criminal law"

-- without any reference to "federal" -- but then continues to state the exception as to

specific federal statutory provisions.  Likewise, part (2) begins with a general reference

to "intellectual property law" -- again without any reference to "federal" -- but then states

an exception for intellectual property laws.  The similarity in format between parts (1)

and (2) demonstrates the intended effect was to provide a general description of the law

each part addresses, and then describe the specific aspects of <u>federal</u> law excepted.[21]

Further, considering the inclusion of parts (3) and (4), reinforces that part (2)

refers only to federal intellectual property laws.  That is, part (3) contains a specific

description as to the impact the CDA has upon state laws, a provision that would be

rendered partially superfluous if part (2) had already addressed state law -- i.e., state

---

[21] It is further unlikely that Congress, a federal body, specifically had in mind the full panoply of various intellectual property laws enacted by all the respective states throughout the country.

intellectual property laws.  Moreover, had Congress intended that part (2) would refer to state intellectual property laws, then part (3) would have added the word "other" to part (3), to reflect that part (2) had already included some state law, and would state instead: "Nothing in this section shall be construed to prevent any State from enforcing any **[other]** State law that is consistent with this section."  The omission of the word "other" in part (3) indicates that parts (1) and (2) had not yet included reference to state laws.

Finally, the inclusion of part (4), further demonstrates that part (2) refers only to federal intellectual property law.  That is, part (4) governs the general category of "privacy law" but then proceeds to list the specific exception to immunity as applicable to "the Electronic Communications Privacy Act of 1986" "or <u>any similar State law</u>." (Emphasis added.)  Accordingly, part (4) demonstrates that where Congress intends to include an exception for state laws that are similar to the federal ones it was addressing, it will do so explicitly.  Unlike part (4), part (2) does <u>not</u> provide that the exception applies "to intellectual property **[or any similar State law]**."  Accordingly, part (4) supports that the intellectual property laws excepted by part (2) are only federal, not state, intellectual property laws.

Because the better interpretation of section 230(e) is the one announced by the Ninth Circuit that excepts only federal intellectual property claims from CDE immunity, this Court should grant the Motion to Dismiss as to Plaintiff's state law claims..

## V.   THE COURT SHOULD REJECT PLAINTIFF'S ARGUMENT AS TO VICARIOUS LIABILITY UNDER ITS "AGENT FOR UNDISCLOSED PRINCIPLE [SIC]" THEORY

Plaintiff opposes dismissal of its Thirteenth Claim for Relief, labeled as "Agent for Undisclosed Principle [sic]," but ignores the multiple, valid arguments Namecheap explained require its dismissal.  [*See* Opp. Memo at 17-18; Supp. Memo at 26-28]. Instead, Plaintiff attempts to save the "claim" with arguments based upon the ICANN RAA, arguing merely that Namecheap is vicariously liable for Tingle pursuant to Section 3.7.7.3 of the RAA.  [*See* Opp. Memo at 23-24].  That argument is without merit.

First, regardless of any definition in the RAA, the RAA cannot change the reality that Plaintiff was the registrar for the subject domain because it processed Goldstein's domain name application and did not make any such application for its own use.

Second, Plaintiff has not alleged anything in its Complaint about the RAA, has not asserted any breach of contract claim against Namecheap, and Plaintiff has absolutely no rights under the RAA.  Section 5.10 of the RAA provides:  "<u>No Third-Party Beneficiaries</u>.  This Agreement shall not be construed to create any obligation by either ICANN <u>or Registrar</u> <u>to any non-party to this Agreement</u>, including any Registered Name Holder."  [Second and third emphases added].  Simply put, Plaintiff cannot use the RAA as a basis for stating a claim against Namecheap and, regardless of the RAA, its claims fail as a matter of law.[22]  *See SolidHost*, 652 F. Supp. 2d at 1118-19 (dismissing breach

---

[22] Plaintiff's reliance on the ICANN RAA with regard to the DMCA, and its attempt to recharacterize Namecheap as the domain "registrant," fails for the same reason.  [*See* Opp. Mem at 4 & n.2].  As described above, the RAA cannot change the reality that Namecheap received and processed the domain name at issue here and did not control or publish the content that ultimately appeared on the website at that domain.  *See infra*,

of contract claim based on RAA because RAA provided it "shall not be construed to create any obligation by either ICANN or Registrar to any non-party to this Agreement, including any Registered Name Holder").[23]

**CONCLUSION**

For all the foregoing reasons and as stated in Namecheap's initial supporting memorandum, Plaintiff's Complaint is irreparably defective.  Namecheap's Rule 12(b)(6) Motion should be granted and all claims asserted against Namecheap should be dismissed with prejudice.

DATED this 6th day of September, 2011.

MAGLEBY & GREENWOOD, P.C.

_____
James E. Magleby
Eric K. Schnibbe
Jennifer Fraser Parrish
and
Eugene Rome
ROME & ASSOCIATES, A.P.C.

Attorneys for Defendant Namecheap, Inc.

---

Argument, Part I.  Providing a service affecting the manner of registration does not alter that it is the domain owner, not Namecheap, that is making the registration application and, by definition, is the "registrant" -- regardless of what contact information ultimately appears in the Whois database.  [*See* Compl. ¶ 10 recognizing WhoisGuard is a service provided "to domain name owners")].

[23] *See also Panavision Int'l L.P. v. Toeppen*, 945 F. Supp. 1296, 1305 (C.D. Cal. 1996) (granting summary judgment despite assertion that "representations and warranties that NSI requires of domain name applicants are made for the benefit of intellectual property owners such as Panavision" and "a jury could not reasonably infer that the Toeppen–NSI contract was intended to benefit intellectual property owners"); *City of Grantsville v. Redevelopment Agency of Tooele City*, 233 P.3d 461, 466 (Utah 2010) ("[O]nly those who are a party to a contract have a legally protectable interest in that contract.").

## CERTIFICATE OF SERVICE

I hereby certify that I am employed by the law firm of MAGLEBY & GREENWOOD,

P.C., 170 South Main Street, Suite 850, Salt Lake City, Utah 84101, and that pursuant

to Rule 5(b), Federal Rules of Civil Procedure, a true and correct copy of the foregoing

**[CORRECTED] REPLY MEMORANDUM IN SUPPORT OF NAMECHEAP'S MOTION**

**TO DISMISS** was delivered to the following this 6th day of September, 2011:

[  ]     Via U.S. Mail

[X]     Via CM/ECF System

[  ]     Via Electronic Mail (as indicated below)

> Randall B. Bateman
>  rbb@batemanip.com
> Perry S. Clegg
>  psc@batemanip.com
> C. Todd Kinard
>  ctk@batemanip.com
> Sarah W. Matthews
>  sm@batemanip.com
> BATEMAN IP LAW GROUP, P.C.
> 8 East Broadway, Suite 550
> Salt Lake City, Utah  84110
>
> *Attorneys for Plaintiff*

_____
Jo Washenko